## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS

| | |
|---|---|
| **FAIR HOUSING CENTER OF CENTRAL INDIANA; TONYA BROWN; and WANDA SYKES,** ) ) ) ) ) | |
| **Plaintiffs,** ) ) | **Case No. 1:16-cv-785** |
| **v.** ) ) | |
| **ANDERSON HOUSING AUTHORITY,** ) ) ) | |
| **Defendant.** ) | |

### CLASS ACTION COMPLAINT

1.      The plaintiffs – public housing tenants and a local fair housing agency – sue defendant Anderson Housing Authority for discrimination on the basis of race, sex, and disability in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701, *et seq.,* and for its failure to maintain its dwellings in a decent, safe, and sanitary condition in violation of state housing laws, Ind. Code §§ 32-31-8 and 36-7-18, and the Housing Act of 1937, as amended, 42 U.S.C. § 1437, *et seq.*

## I. Jurisdiction and Venue

2.     This Court has subject-matter jurisdiction over plaintiffs' federal claims under 28 U.S.C. § 1331.

3.     This Court has subject-matter jurisdiction over plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because they arise from the same events as plaintiffs' federal claims and so form part of the same Article III case or controversy.

4.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because the defendant resides in this judicial district and all the events at issue occurred here.

## II. Parties

5.     **Plaintiff Fair Housing Center of Central Indiana** is a nonprofit corporation with a mission of ensuring equal housing opportunities by eliminating housing discrimination through advocacy, enforcement, education and outreach. It is headquartered in Indianapolis.

6.     **Plaintiff Tonya Brown** is a resident at Westvale Manor, which is owned and operated by defendant Anderson Housing Authority. She is black and a person with disabilities.

7.     **Plaintiff Wanda Sykes** also resides at Westvale Manor. She also is black and a person with disabilities.

8.     **Defendant Anderson Housing Authority** is a "public housing authority" within the meaning of Ind. Code § 36-7-18, a "landlord" within the meaning of Ind. Code § 32-31-8, a "public housing agency organization," within the meaning of the Housing Act of 1937, as amended, 42 U.S.C. § 1437, a "program or activity receiving Federal financial assistance" within the meaning of the Rehabilitation Act, 29 U.S.C. § 794, and a "person" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(d).

### III.  Facts

### A. The Anderson Housing Authority

9.     The Anderson Housing Authority (AHA) is a municipal corporation, established in 1975 for the purpose of providing "safe and sanitary dwelling accommodations for persons of low income." Ind. Code § 36-7-18-2. AHA is empowered to buy, sell, lease, fix, repair, hold, improve, insure, and dispose of real property. Ind. Code § 36-7-18-18. It may take property by eminent domain and is exempted from local and state taxation. Ind. Code § 36-7-18-25 &

18-18.

10.     Despite these sweeping powers and privileges, AHA may employ its powers only as is "necessary to obtain safe, sanitary, and uncongested dwelling accommodations within the jurisdiction of the authority." Ind. Code § 36-7-18-26. It also remains subject to state and local laws "regarding planning, zoning, sanitation, and building," just like any other Anderson landlord. Ind. Code § 36-7-18-29.

11.     AHA's principal function is accessing federal funds for local benefit.  It "may do all things necessary or desirable to secure the financial aid or cooperation of the federal government in the undertaking, construction, maintenance, or operation of a housing project by the authority." Ind. Code § 36-7-18-35.  Consequently, its operations and conduct are "subject to supervision and control by the federal government." Ind. Code § 36-7-18-40.

12.     Although the federal government has funded and insured public housing since the New Deal, its current system of funding through local housing authorities did not take-off until 1965, when Congress established the United States Department of

4

Housing and Urban Development. HUD originally used its authority to fund local housing agencies under the Housing Act of 1937 to construct conventional public housing. It stopped abruptly in 1974, with the passage of the Housing and Community Development Act, 12 U.S.C. § 1706e, in which Congress legislated an about-face away from building conventional public housing and toward subsidizing rents in the private housing market.

13.    As HUD's funding grew, so did the number of local housing authorities. Today 1.2 million families depend on federally funded housing administered through more than 3,000 public housing authorities. And as the number of housing authorities grew, so did their powers. The Quality Housing and Work Responsibility Act of 1998 overhauled the Housing Act of 1937, devolving responsibility for administering public housing and voucher programs to local housing authorities, 42 U.S.C. § 1437(a)(1)(C), but subject to HUD's review and approval of each housing authority's annual and five-year expenditure and management plans, 42 U.S. Code § 1437c–1.

14.    HUD oversees local housing authorities through Annual

Contributions Contracts executed between HUD and each local housing authority. 42 U.S.C. § 1437f. Annual Contributions Contracts create a legal relationship between HUD and local housing agencies. *Id.* Once that relationship is established, HUD subjects each local housing authority to wide variety of statutory and regulatory requirements. *Id.*; 24 C.F.R. §§ 900-999.

15.     Although these mandates vary from program to program, they consistently impose four requirements on the Anderson Housing Authority and every other local housing authority:

> a.    That it maintain each dwelling funded with HUD money "in a decent, safe, and sanitary condition," 42 U.S.C.A. § 1437d(l)(3);
>
> b.    That it limit rents to no more than 30% of a family's adjusted income, 42 U.S.C. § 1437a(a)(1);
>
> c.    That it limit its assistance to low-income families and individuals earning below 80 percent of the area median income (AMI), and for some programs as low as 50 percent, or even 30 percent, of AMI, 42

6

U.S.C. § 1437a(b)(2); and,

d.   That it comply with all federal civil rights laws, including the Fair Housing Act's command, 42 U.S.C. § 3608, to "affirmatively further fair housing." 42 U.S.C. § 1437c–1(b)(3)(B).

16.   The federal duty to comply with fair housing laws is embedded in each annual plan submitted by AHA to HUD for review and approval.

17.   The requirement that AHA maintain each dwelling in a "decent, safe, and sanitary condition" is amplified in federal regulations, which compel AHA -

a.   To comply with applicable building codes, housing codes and HUD regulations materially affecting health and safety;

b.   To make necessary repairs to each dwelling unit owned or operated by AHA;

c.   To keep the common areas of each project owned or operated by AHA in a clean and safe condition; and,

d.   To maintain in good and safe working order all

7

electrical and mechanical systems and appliances supplied by AHA or required to be supplied by AHA. 42 U.S.C. § 1437d(l)(3); 24 C.F.R. § 966. These requirements are so fundamental that HUD requires AHA to insert these maintenance obligations in its leases with tenants, 24 C.F.R. § 966.4, and in its annual certifications to HUD, 42 U.S.C. § 1437c-1(d), 24 C.F.R. § 903.

## B. Dwellings Owned or Operated by Anderson Housing Authority

18.    AHA operates three housing programs. First, it issues housing choice vouchers, which subsidize the rental of private dwellings by poor families. Second, it manages single family dwellings whose construction was funded under Low Income Housing Tax Credit Program. Third, it owns and operates five conventional public housing projects.

19.    Of the five conventional housing projects owned and operated by AHA, three are groups of single family dwellings. Two – Westvale Manor and Lynwood Village – are multifamily housing.

20.    Lynwood Village consists of 20 dwellings in five separate

buildings at the end of Miller Avenue outside of Anderson's city center It is located within a census block group that is 2% black. Nine of Lynwood's 20 heads of household are black. AHA maintains Lynwood Village, ensuring that its dwellings are decent, safe and sanitary.

21.    Westvale Manor is a different story.  It consists of 45 dwellings in eight separate buildings on Fulton Street near Anderson's city center. It is located within a census block group that is 53% black. Thirty of Westvale's head of household are black, 14 are white, and one is of mixed-race. Westvale has the highest concentration of black tenants of any housing project owned or operated by AHA. It is also located in a neighborhood with the highest concentration of black residents of any housing owned or operated by AHA.

22.    AHA discriminates against Westvale residents because of the racial composition of the neighborhood where Westvale is located and because of the racial composition of its residents. On the one hand, Lynwood Village is situated in a white neighborhood and the AHA maintains Lynwood in a safe and sanitary condition.

On the other hand, Westvale is situated in a black neighborhood, a majority of its residents are black, and AHA fails to maintain Westvale in a safe and sanitary condition.

23.    AHA so consistently and deliberately disregards complaints by Westvale's black residents that most long-term tenants long ago gave up asking AHA for help. Complaints are ignored or, worse, they result in retaliation. Nonetheless, in late 2014, Wanda Sykes, a Westvale resident since 2008, reached out to the Fair Housing Center of Central Indiana for help. In response, the Fair Housing Center conducted an extensive, year-long investigation, interviewing over 30 current and former residents of Westvale during several site visits to the apartments. A summary of that investigation follows:

### C. AHA's Failure to Maintain

24.    Westvale residents interviewed by the Fair Housing Center uniformly reported horrible conditions, indifference to their requests for maintenance, and even that AHA staff specifically instructed them not to ask for repairs. These are just some of the most common complaints:

25.   **Leaks**: Some Westvale residents reported that their dwelling units were literally falling apart. One resident has had a leak in his bedroom ceiling for two and a half years. Another resident has a hole in her bedroom:



The hole leaks, and this forces the resident to sleep in her living room. A leak from the closet ceiling of another resident destroyed her clothes. Three more residents reported leaks into their bathrooms. Another resident reports that leaks caused her ceiling to collapse in her dwelling.

12

26.    This leak recently appeared in Tonya Brown's ceiling:



27.    Even for major issues like leaks, the AHA responds slowly, sometimes not at all. One resident with a hole in his ceiling waited over a year. Another resident waited so long for AHA to fix her ceiling that bats found their way into her apartment.

28.     **Mold**: With all the water infiltration, conditions are ripe for mold. Nine residents reported visible mold in their units, like this:



And this:



And this:



One resident tested the mold in her unit, using a kit bought at a

local store. The test indicated the mold was "dangerous." The resident shared the test results  with Charles Weatherly, Jr., then the head of maintenance and now the executive director of the AHA, who did nothing. Another resident became so frustrated with AHA ignoring her mold-related maintenance requests that she bagged up some of her son's moldy clothing and dumped it at the AHA office. Until then the AHA had refused to move her and her children out of their mold-ridden unit. Afterward, they moved her, but told her not tell anyone about it. Another resident, with a leak in her bedroom ceiling, was just given a bucket.

29.   **Shower Curtains for Doors**. Several residents reported that when closet doors would break, the AHA, if it did anything, would replace them with shower curtains like so:

 

30.    **Heating and Air Conditioning**: Two residents reported that their air conditioning was broken throughout entire summers. Four reported that their in-unit air conditioners leaked:



Some of these leaks were so bad that the air conditioners could not be used without damaging walls and carpet, as seen in the photo below, which is the floor under the air conditioner shown in the photo above:



Two residents reported malfunctioning heaters: one resident's heater turns on randomly, the other's won't stop unless she turns it off by tripping a circuit breaker.

31. **Trash Removal:** Another common complaint was the AHA's trash removal practices. Residents place their own trash in dumpsters, which the AHA is obligated to empty. Three residents complained that the AHA would simply let the dumpsters fill up and then overflow. Then, to make matters worse, the spilled trash would blow into the property's grass where maintenance men would simple mow over it, scattering bits of trash everywhere.

32. **Snow Removal:** Ten residents reported that the AHA removes snow from the property's walkways and parking lots only rarely and that, when it does, it leaves only narrow pathways completely inaccessible to those residents with walkers and wheelchairs. A related problem: When the snow piles up, many residents get stuck, unable to open exterior doors. This has consequences. One resident could not get her son to school or work because, with his wheelchair, he could not pass around the snow.

This resident reported the problem to Resident Manager Connie Klungness, who did nothing. Two residents reported not being able to get out to take out their trash, which just piled up in their units.

33.   **Common Area Maintenance and Safety:** The Anderson Housing Authority also disregards its duty to maintain the Westvale's common areas. Two residents reported a large hole in the parking lot. Several reported that outer security doors were broken and thus effectively unlocked, allowing anyone to enter the common hallways and come right up to residents' doors. Many residents reported concerns about safety. Another resident reported telling AHA's Charles Weatherly Jr. that a hallway light was out, waiting for several weeks with no response, and then finally calling the Fire Department. To the resident, the missing light was not trivial: The hallway lacks windows, and the burned-out light has been its only illumination.

34.   **Pests:** Six residents reported problems with roaches, termites, or bed bugs. Many of these residents, those with bed bugs especially, had to throw out mattresses and clothing. All were unhappy with how slowly and how ineffectively the AHA handled

the problem.

35.   **AHA Indifference:** Almost every resident the Fair Housing Center interviewed reported that no matter who they spoke with or how many times they asked for help, the AHA ignored them. One resident had a hole in her wall for four years. Others—like the resident who called the Fire Department about the hallway light— felt compelled to look outside AHA for help. One contacted Anderson's mayor about the trash problem. Multiple residents reported that the AHA had told them to stop complaining. One even reported that Charles Weatherly Jr. told him to "get lost" after he told Weatherly about a maintenance issue.

36.   **Discouraging Complaint:** The AHA even wrote letters telling residents not to complain. The letters warned residents that their annual unit inspections were "not the time to report problems." These inspections are conducted by the United States Department of Housing and Urban Development. The letters instructed residents that the inspectors "should not be spoken to during" the inspections. One resident reported that, before an inspection, Charles Weatherly, Jr. came to her unit, noticed a non-

compliant fuse, and moved her refrigerator to hide it.

## D. AHA's Fair Housing Violations

37.    In    addition    to    deplorable,    race-based    housing conditions, Westvale residents also reported to the Fair Housing Center that reasonable accommodation requests were ignored or denied and that several AHA maintenance men demanded sexual favors from female residents in exchange for needed repairs.

## Sexual Harassment

38.    For years, the AHA's maintenance men have used their positions to sexually exploit Westvale's female residents.

39.    **Resident Jane Doe.** Jane Doe is a Westvale resident. She has been sexually harassed by two separate maintenance men.

40.    When Doe asked maintenance man Brian about having her carpet cleaned, Brian told her that if she were to "suck [his] dick," then her carpet would get cleaned faster.

41.    Another maintenance man, Billy, gropes Doe's breasts and butt whenever he passes her at Westvale, especially on the narrow staircases.

42.    Billy has also visited Doe's unit on the pretense of

performing maintenance, only to grope Doe and, when Doe protests, to leave without fixing anything.

43.   Doe has heard from other women that they experience similar treatment by the maintenance staff.

44.   **Other Harassment Victims.** Doe's experience is consistent with that of other women at Westvale.

45.   One female resident reported that maintenance man Billy has repeatedly tried to put his hands under her dress and asked her to "show [him her] titties."

46.   Another female resident reported that, when she asked Charles Weatherly Jr. about moving to a larger unit, he told her, suggestively, she could move into a larger unit if she moved in with him.

47.   One resident reported that her sister-in-law was harassed while babysitting for the resident. While the sister-in-law was in the resident's unit, a maintenance man said to her, suggestively, "Why don't you babysit me?"

48.   Another resident reported that a maintenance man named Curtis was so aggressive in asking her for sex that she

sought a restraining order against him. The resident also complained to Connie Klungness, who, according to the resident, did nothing. The maintenance man continued to work at Westvale for another two years.

49.     Yet another resident reported that Billy asked to "hop in bed" with her while at her front door.

## Reasonable Accommodation

50.     AHA is also indifferent to the requests of Westvale residents with disabilities for reasonable accommodations and modifications.

51.     **Plaintiff Wanda Sykes.** Sykes is a Westvale resident.

52.     Sykes has disabilities. She receives Social Security Disability Income based on a number of ailments including back and leg problems that prevent Sykes from safely negotiating stairs.

53.     AHA is aware that Sykes is disabled and that she cannot handle stairs because she has repeatedly told them so in "Personal Declaration" forms that the AHA has her fill out each year.

54.     Since moving into Westvale, Sykes has repeatedly

sought a reasonable accommodation of her mobility disability by asking to be placed in a ground floor unit. She needs that accommodation because, due to her disabilities, she cannot safely negotiate stairs. Most of her requests have been ignored and one was even met with a threat.

55.     Sykes first requested a reasonable accommodation a few months before she moved in to Westvale, during the application process.

56.     To make the request, Sykes went to the AHA office to drop off a letter from her doctor.

57.     Sykes gave the letter, which explained that Sykes needed a ground floor unit due to her disability, to an AHA employee named Patti to give to Connie Klungness.

58.     Patti told Sykes that she would give Klungness the letter.

59.     Sykes never heard anything about her request.

60.     Practically speaking, it was rejected because when Sykes received her keys from the AHA, the keys were for a second floor unit at Westvale.

61.     About two months later Sykes ran into Klungness and asked about moving to a ground floor unit.

62.     Sykes explained that she had given Patti a doctor's letter to give to Klungness. Klungness claimed not to have received it.

63.     Sykes obtained a new doctors' letter and went to the AHA office. She again gave the letter to Patti, telling Patti that "I really can't do the stairs." Patti said she would give the letter to Klungness.

64.     AHA never responded to Sykes's   doctor's letter.

65.     Years later Sykes made another request for the same reasonable accommodation.

66.     This time Sykes called Klungness.

67.     Sykes told Klungness about her doctors' notes and that she very rarely left her unit because she was afraid of the stairs.

68.     Klungness responded that they only way she could move was to move to the other side of the building.

69.     That side of building was known to Klungness and Sykes as a dangerous place, home to drug and gang violence.

70.     Sykes took this "offer" as a threat and believes it was intended as a threat.

71.     Klungness never followed up, and because of the threat, Sykes did not either.

72.     Still, Sykes continued to fill out the "Personal Declaration" forms. Most recently, in April 2015, she checked the boxes for "disabled" and "Cannot handle stairs." The AHA did nothing.

73.     **Tonya Brown.** Brown is a resident of Westvale.

74.     Brown has disabilities. She has received Social Security Disability Benefits for the last several years. She has had a hip replacement with related lower back pain and has been diagnosed with chronic obstructive pulmonary disease. She has breathing problems for which she uses an inhaler.

75.     Brown has requested the same reasonable accommodation annually for several years.

76.     Every year, Brown, like all Westvale residents, visits the AHA office for a recertification appointment, the purpose of which is to recertify Brown's eligibility, financially, to continue living at

Westvale.

77.     Every year, at her recertification appointment, Brown asks to be relocated out of Westvale as a reasonable accommodation to her disabilities.

78.     In 2012, she brought a doctor's note to her recertification appointment.

79.     The doctor's note read "please consider releasing [Tonya Brown] from her housing lease with in the next month as her current living conditions are detrimental to her health."

80.     Brown showed the note directly to Connie Klungness, who handles the recertification appointments.

81.     Based on the note, Brown asked to be moved from Westvale to other AHA housing.

82.     Brown has explained that the mold and other irritants at Westvale are dangerous to her.

83.     Without engaging in any interactive process, Klungness denied Brown's request.

84.     This pattern, Brown's request and Klungness's flat-out denial, has repeated every year since then.

85.   **Jane Roe.** Jane Roe is a resident of Westvale. She lives there with her son, who has cerebral palsy and uses a wheelchair.

86.   During a past winter, it snowed a great deal, blocking the doors and sidewalks of Westvale.

87.   The AHA has a de facto policy of ignoring its obligation to remove the snow that blocks the doors and sidewalks of Westvale.

88.   When the AHA does clear any snow, it only leaves a path on the sidewalk that is too narrow for a wheelchair.

89.   Roe repeatedly asked the AHA to clear the snow, including by asking Connie Klungness. Roe explained that the request was to accommodate her son's wheelchair.

90.   The AHA ignored Roe's requests, in effect, rejecting them.

91.   On several occasions, the snow was so high that she was unable to help her son get out of their Westvale building, down the sidewalk and to the bus he takes to get to school and work.

92.   **John Doe.** John Doe has been a Westvale resident for over a decade.

93.     John Doe has disabilities. He has a coronary artery disease and anxiety. He receives disability benefits.

94.     Once, about 5 years ago, John Doe requested that the AHA transfer him to a less dilapidated unit.

95.     He never received a response.

96.     Then, about 9 months ago, John Doe made the same request to Connie Klungness at the AHA office.

97.     John Doe brought a doctor's note with him recommending the transfer.

98.     Klungness put the note in John Doe's file but never responded to the request.

### E. AHA Reacts to the
### Fair Housing Center's Investigation

99.     The Fair Housing Center devoted an extraordinary amount of its staff time and resources to speaking with, meeting with, and counselling Westvale residents about their Fair Housing rights and options.

100.    The Fair Housing Center notified the AHA of its investigation by letter in July 2015.

101.    Since then, residents have reported back to the Fair Housing Center that AHA employees have been inquiring about the investigation; and in particular which residents have cooperated in it.

102.    Residents also reported that, often for the first time in decades, repairs are being made and requests are being answered.

103.    Some residents, including Tonya Brown, reported that, they were suddenly being given Housing Choice Vouchers. This came as a surprise, as many residents had been told they were no longer on the voucher waiting list.

## IV.    Unlawful Housing Practices

104.    AHA, acting through its officers, employees and agents, has engaged in a pattern or practice of unlawful conduct and discrimination, including commission of the following unlawful housing practices:

> a.    failing to deliver rental premises to tenants in a safe, clean, and habitable condition, Ind. Code § 32-31-8-5(1);
>
> b.    failing to comply with all health and housing codes

applicable to the rental premises, Ind. Code § 32-31-8-5(2);

c.   failing to make all reasonable efforts to keep common areas of a rental premises in a clean and proper condition, Ind. Code § 32-31-8-5(3);

d.   failing to maintain in a good and safe working condition Westvale's sanitary systems, air condition systems, and appliances, Ind. Code § 32-31-8-5(4)

e.   discriminating in the terms, conditions or privileges of rental of dwellings because of race and sex, 24 C.F.R. § 100.50(b)(2);

f.   discriminating in the provision of services and facilities in connection with the rental of dwellings because of race and sex, 24 C.F.R. § 100.50(b)(2);

g.   denying or limiting services or facilities in connection with the rental of dwellings because of race and sex, 24 C.F.R. § 100.65(a);

h.   failing or delaying maintenance or repairs in connection with the rental of dwellings because of

race and sex, 24 C.F.R. § 100.65(b)(2);

i.   denying or limiting services or facilities in connection with the rental of dwellings because a person failed or refused to provide sexual favors, 24 C.F.R. § 100.65(b)(5);

j.   assigning any person to a particular section of a community, neighborhood or development because of race, 24 C.F.R. § 100.70(c)(4);

k.   coercing, intimidating, threatening, or interfering with persons in their exercise or enjoyment of, or on account of their having exercised or enjoyed, their fair housing rights, 24 C.F.R. § 100.400(b);

l.   coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the rental of a dwelling because of sex and disability, 24 C.F.R. § 100.400(c)(1); and,

m.   threatening, intimidating, or interfering with persons in their enjoyment of a dwelling because of

34

sex and disability, 24 C.F.R. § 100.400(c)(2).

105.    AHA injured each plaintiff by committing each of these unlawful housing practices.

## V. Injuries

106.    **The Fair Housing Center.** The AHA's discriminatory and negligent actions have caused, and are continuing to cause harm to the Fair Housing Center by frustrating its mission to ensure equal housing opportunities. The AHA's actions have interfered with all the efforts and programs of the Fair Housing Center by forcing to divert its scarce resources from programs designed to ensure equal housing opportunity and into efforts necessary to identify, investigate, and counteract the AHA's unlawful practices. The AHA's practices have cost the Fair Housing Center money in the form of diverted staff pay and funds expended in investigation and they have hurt the Fair Housing Center by rendering it to occupied to prevent other discrimination. Accordingly, the Fair Housing Center is entitled to compensatory damages.

107.    **Wanda Sykes's Injuries.** The AHA's repeated failures

to reasonably accommodate Syke's disability have injured her profoundly. Sykes has spent years knowing that if she wants to leave her home, she must negotiate stairs that are dangerous to her. Though she has only fallen hard once, every time she uses the stairs she is afraid. Sykes has suffered emotional distress in the form of fear, anger, frustration, and embarrassment caused by the AHA's indifference and threats. Accordingly, she is entitled to compensatory damages.

108.    **Tonya Brown's Injuries.**  The AHA's repeated failures to reasonably accommodate Brown's disability have injured her profoundly. Brown knows that her environment is, as her doctor said, detrimental to her health. Knowing this, and knowing that she cannot leave, causes her emotional distress. Accordingly, she is entitled to compensatory damages.

109.    There now exists an actual controversy between defendants and plaintiffs regarding defendants' duties under federal and state law. Accordingly, plaintiffs are entitled to declaratory relief.

110.    Unless enjoined, defendants will continue to engage in

the unlawful acts and the pattern or practice of discrimination described in this complaint. Plaintiffs have no adequate remedy at law. They now suffer and will continue to suffer irreparable injury from defendants' discriminatory acts unless relief is provided by this Court. Accordingly, plaintiffs are entitled to injunctive relief.

## VI. Claims

### A. First Claim
### [Federal Fair Housing Act]
### All Plaintiffs v. Anderson Housing Authority

111.    Plaintiffs incorporate here by reference all previous allegations.

112.    The AHA, through its employees and agents, has committed discriminatory housing practices.

113.    Sykes, Brown, and the Fair Housing Center have been injured by those discriminatory housing practices and are therefore aggrieved persons entitled to sue under 42 U.S.C. § 3613.

### B. Second Claim
### [Rehabilitation Act]
### Wanda Sykes & Tonya Brown v. Anderson Housing Authority

114.    Plaintiffs incorporate here by reference all previous allegations.

115.    The AHA's housing programs are programs or activities that receive federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(a).

116.    The AHA has excluded from, denied the benefits of, and subjected to discrimination Wanda Sykes and Tonya Brown solely because of their disability so violating Rehabilitation Act, 29 U.S.C. § 794(a).

## C. Third Claim
## [Indiana Code § 32-31-8]
## Wanda Sykes & Tonya Brown v. Anderson Housing Authority

117.    Plaintiffs incorporate here by reference all previous allegations.

118.    Indiana Code § 32-31-8-5 obligates landlords in Indiana to, among other things, maintain rental premises in a clean, functional, and habitable condition.

119.    The Anderson Housing Authority is a landlord as to Westvale Manor.

120.    The Anderson Housing Authority routinely violates its obligations under § 32-31-8-5.

121.    Accordingly, Wanda Sykes and Tonya Brown seek an injunction requiring the Authority to remedy its deficient practices and comply with Indiana law.

122.    Sykes and Brown seek this injunction on behalf of a class of others similarly situated under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

123.    Plaintiffs' class allegations are as follows.

124.    **Class Definition:** Wanda Sykes and Tonya Brown seek

certification, under Rule 23(b)(2) of the Federal Rules of Civil Procedure, of a class of all current and future tenants of Westvale Manor.

125.    **Numerosity:** The class is so numerous that joinder is impracticable.

126.    **Adequacy:** Wanda Sykes, Tonya Brown, and their counsel will adequately represent the class's interests.

127.    **Typicality:** The claims of Wanda Sykes and Tonya Brown are typical of the claims of the class. All are current tenants of Westvale Manor and all have been subjected to the AHA's deficient maintenance practices. In particular, they have all been subjected to the AHA's failure to deliver rental premises to tenants in a safe condition, Ind. Code § 32-31-8-5(1), and the AHA's failure to make all reasonable efforts to keep common areas of a rental premises in a clean and proper condition, Ind. Code § 32-31-8-5(3). Absent the relief sought here, all future tenants will be too.

128.    **Commonality:** The claims of Wanda Sykes and Tonya Brown contain many common questions of fact and of law, including whether the AHA has violated § 32-31-8-5(1) & (3).

129.    **Ascertainability:** The class would be readily ascertainable, that is, identifiable, from the records of the AHA. The AHA uses a software program, Yardi Voyager, to maintain its rental records. That software, according to the Yardi website, is capable of delivering the information Plaintiffs need to identify the class.

130.    **Rule 23(b)(2):** The AHA has acted and failed to act in on grounds generally applicable to the class as a whole so that final injunctive relief and declaratory relief is appropriate respecting the class as a whole.

## VII. Prayer for Relief

Plaintiffs pray for a judgment against Defendants awarding:

1.    Actual and compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c);

2.    A declaration that Defendants have violated the federal Fair Housing Act and Indiana Code § 32-31-8-5;

3.    Injunctive relief to stop the unlawful and discriminatory practices identified in this complaint and affirmatively requiring Defendants and all their agents to take steps to provide equal housing opportunity to all disabled and female residents and to

maintain habitable conditions at the Westvale Manor;

4.      Injunctive relief under Indiana Code § 32-31-8-6(d)(2);

5.      Attorneys' fees and costs under the federal Fair Housing Act, 42 U.S.C. § 3613(c); and Indiana § 31-8-6(d)(1)(B); and,

6.      All other relief that the Court deems just

Dated: April 11, 2016.

                                        Respectfully submitted,

                                        /s/ Christopher E. Clark
                                        Christopher E. Clark
                                          Indiana Bar No. 18577-29
                                        Emma Mahern
                                          Indiana Bar No. 32057-49
                                        GOODIN ABERNATHY, LLP
                                        8900 Keystone Crossing, Ste. 1100
                                        Indianapolis, IN 46240
                                        tel: 317.843.2606
                                        fax: 317.574.3095
                                        cclark@goodinabernathy.com
                                        emahern@goodinabernathy.com

                                        Attorneys for Plaintiff